UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

CYLE KREPPS,

Defendant.

Case # 12-CR-6021-FPG

DECISION AND ORDER

## INTRODUCTION

On April 30, 2020, Defendant Cyle Krepps filed an Emergency Motion to Reduce Sentence. ECF No. 62. Defendant requests that the Court reduce his sentence to time served because of the ongoing Coronavirus Disease 2019 ("COVID-19") pandemic. *Id.* The Government opposes the Motion. ECF No. 65. For the reasons that follow, Defendant's Motion is DENIED.

## BACKGROUND

On April 24, 2013, Defendant pleaded guilty to one count of conspiring to possess with the intent to distribute, and to distribute, 280 grams or more of cocaine base in violation of 21 U.S.C. § 846—a charge that carries a mandatory minimum term of imprisonment of ten years—and one count of possessing a firearm in furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c)(1)—a charge that carries a mandatory minimum term of imprisonment of five years. ECF Nos. 1, 34, 35; 18 U.S.C. § 924(c)(1); 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846. Defendant's plea provided that his sentences for these two counts would be served consecutively. ECF No. 35 ¶ 1. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), Defendant and the Government agreed to a 196-month sentence. ECF No. 35 ¶ 14. On September 16, 2013, Defendant was

1

sentenced to 196 months in the custody of the Federal Bureau of Prisons ("BOP") and five years' supervised release. ECF Nos. 40, 41.

On February 25, 2015, Defendant moved to reduce his sentence to 180 months pursuant to 18 U.S.C. § 3582(c)(2), which permits the Court to reduce "a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." *Id.*; ECF Nos. 49, 50. On February 2, 2016, the Court granted Defendant's motion, in part, and reduced his sentence from 196 months to 181 months. ECF No. 60. Defendant is currently projected to be released on August 17, 2024. ECF No. 64 at 1; ECF No. 65-3 at 2.

## LEGAL STANDARD

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute." *United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020). Courts may reduce previously imposed terms of imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A), often referred to as compassionate release. Defendants may bring motions under Section 3582(c)(1)(A) if they have satisfied a statutory exhaustion requirement.[1] *Id.* The Court may grant relief if it finds that (1) "extraordinary and compelling reasons warrant [the] reduction" and (2) the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id.* The Court must also consider the sentencing factors set forth in Section 3553(a). *Id.* §§ 3553(a), 3582(c)(1)(A). In analyzing these elements and factors, "[d]istrict courts have broad discretion in deciding whether to grant or deny a motion for a sentence reduction." *United States v. Tagliaferri*, No. 13-CR-115, 2019 WL 6307494, at *3 (S.D.N.Y. Nov. 25, 2019). If the Court grants such a motion, it may reduce the defendant's term of imprisonment and may correspondingly impose a

---

[1] The Government does not dispute that Defendant has satisfied the statutory exhaustion requirement. ECF No. 65 at 1, 5 n.2.

term of probation or supervised release, with or without conditions, provided that such a term does not exceed the unserved portion of the original term of imprisonment. 18 U.S.C. § 3582(c)(1)(A).

## DISCUSSION

In this case, even if Defendant could establish that extraordinary and compelling reasons warrant a reduction and it would be consistent with the applicable Sentencing Commission policy statement, a sentence reduction would not be warranted. Defendant has not presented evidence that causes the Court to reconsider its prior evaluations of the factors set forth in Section 3553(a).

Under Section 3553(a), a court must consider the following factors when it imposes a sentence:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range [provided for by Sentencing Commission guidelines and policy statements];
> (5) any pertinent [Sentencing Commission policy statement];
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Court weighed these factors when it imposed Defendant's original term of imprisonment in 2013 and again in 2016 when it reduced his term of imprisonment. ECF Nos. 40, 41, 47, 60. Accordingly, the Court's task here is not to "second guess or to reconsider whether"

his current sentence is just, but to assess whether "the defendant's circumstances are so changed . . . that it would be inequitable to continue the confinement of the prisoner." *United States v. Ebbers*, 432 F. Supp. 3d 421, 429–30 (S.D.N.Y. 2020) (internal quotation marks omitted) (discussing legislative history of Section 3582). In other words, the issue is whether the original Section 3553 factors "outweigh the 'extraordinary and compelling reasons' warranting compassionate release," and, in particular, "whether compassionate release would undermine the goals of the original sentence." *Id.* at 430–31.

Here, Defendant's primary basis for compassionate release is his claim that he is particularly susceptible to COVID-19 and he faces a greater risk of contracting the disease while incarcerated. ECF Nos. 62, 68. The Court's task is to determine what weight, if any, to give these considerations[2] in evaluating whether they outweigh the Section 3553 factors supporting Defendant's sentence. *Ebbers*, 432 F. Supp. 3d at 429–31. Such an inquiry requires the Court to evaluate two questions: (1) to what degree, if at all, do Defendant's medical conditions increase his risk of COVID-19 infection or complications; and (2) to what degree, if at all, are Defendant's chances of contracting COVID-19 increased while incarcerated compared to if he were released? Perhaps unsurprisingly given the ubiquitous uncertainty associated with COVID-19, the record does not permit the Court to convincingly answer either question.

Defendant claims that he suffers from various ailments—asthma, high blood pressure, seizures, chronic kidney disease, and chronic pain stemming from a gunshot wound—that debilitate his immune system and increase his risk of infection, complications, and death due to COVID-19. ECF No. 62 at 2; ECF No. 68 at 2, 4–6. Defendant is thirty-two and his presentence investigation report notes that he suffers from asthma—which was untreated—and that he was

---

[2] The Court may take the Defendant's medical condition into account at sentencing and consider potential consequences of the types of sentences available. *See* 18 U.S.C. § 3553(a)(1), (a)(3).

4

shot in the hand and head in 2007—but he reported no ongoing impact from the wounds. ECF No. 61 ¶ 76; ECF No. 62 at 10. According to the warden of Defendant's facility, Defendant is receiving treatment for asthma, seizures, and hypertension, and all three conditions are stable and controlled with medication. ECF No. 64-1. Defendant's medical records[3] show treatment for asthma (described as "well controlled" as of November 2018), seizures (described as in remission), hypertension (described as "Benign Essential"), and chronic kidney disease (described as "stage 2 (mild)"). ECF No. 68-4 at 8, 10–12, 15, 20, 23–28, 31–44, 53–54, 57–62, 67–70, 73–84. Although Defendant's medical records reflect several preexisting conditions, Defendant is classified as "Medical Care Level 1," which is the lowest severity of the four medical care levels within the BOP. ECF No. 64 at 1.

Defendant submits declarations previously submitted in another case by Nina H. Fefferman, Ph.D., and Joe Goldenson, M.D. ECF Nos. 68-1, 68-3.[4] Goldenson stated that the case fatality rate for COVID-19 is elevated for those over fifty and for those with cardiovascular disease, respiratory disease, and a compromised immune system. ECF No. 68-3 ¶ 9; *see also* ECF No. 68-3 ¶ 40 n.20 (defining medically vulnerable inmates as individuals of any age with, *inter alia*, asthma, chronic kidney disease, seizure disorders, or hypertension). Fefferman noted that certain medical conditions, such as hypertension and asthma, among others, increase the probability of death resulting from COVID-19 infection. ECF No. 68-1 ¶ 7. Fefferman stated that age increases COVID-19 fatality risk for those over the age of fifty-five. *Id.*

---

[3] Defendant argues that his medical records do not accurately reflect his health because the medical staff are incompetent and deliberately indifferent toward Defendant. ECF No. 62 at 9.

[4] Fefferman's and Goldenson's declarations were originally filed with a petition for habeas corpus/class action in the District of New Jersey seeking release of medically vulnerable inmates at Fort Dix. *See Wragg v. Ortiz*, No. 20-CV-5496, 2020 WL 2745247 (D.N.J. May 27, 2020). In denying relief, the Court discussed Goldenson's opinion at length but did not discuss Fefferman's opinion. *Id.* at *22.

Defendant is currently incarcerated in New Jersey at FCI Fort Dix, a low-security correctional institution that houses 2,713 inmates, including 176 in an adjacent minimum-security satellite camp. ECF No. 64 at 1; ECF No. 65 at 2; *FCI Fort Dix*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/ftd/ (last visited July 17, 2020). Currently, BOP reports that five Fort Dix inmates are infected with COVID-19, thirty-five inmates have recovered from COVID-19 infection, and five staff members have recovered. *COVID-19 Coronavirus*, FEDERAL BUREAU OF PRISONS, http://www.bop.gov/coronavirus/ (last visited July 17, 2020). Defendant claims that Fort Dix had thirteen confirmed cases (ten inmates and three staff) and twenty quarantined inmates as of April 21, 2020. ECF No. 62 at 3; *see also* ECF No. 64 (reporting twenty-two positive inmates, one positive staff member, twenty-six recovered inmates, and four recovered staff members as of May 21, 2020).

Goldenson noted that detention facilities, like Fort Dix, have a history of high transmission rates for infectious diseases and opined that COVID-19 would be particularly difficult to control in a detention facility. ECF No. 68-3 ¶¶ 17, 19, 21, 23–27, 29–30, 36–41. Goldenson concluded that both the risk of infection and the risk of severe complications is heightened in detention facilities relative to the community. *Id.* ¶¶ 21–22, 37. Fefferman similarly posits that incarceration itself tends to result in less favorable health outcomes. ECF No. 68-1 ¶¶ 22, 24. In late April 2020, Fefferman reported that the rate of infection at Fort Dix exceeded the rate of infection in New Jersey as a whole. *Id.* ¶¶ 13–16. She explained that Fort Dix's operations inherently increase the risk of COVID-19 transmission compared to the risk in the community at large. *Id.* ¶ 19.[5]

---

[5] Defendant also submits the affidavit of Brie Williams, M.D. ECF No. 68-4 at 2–8. She explains that she is submitting her "affidavit in support of any defendant seeking release from custody during the COVID-19 pandemic [with some restrictions]." *Id.* ¶ 4. Although the affidavit does not relate specifically either to the Defendant or Fort Dix, Williams generally opines that prison facilities face challenges in controlling the spread of COVID-19 and that prisoners suffering from chronic conditions, such as hypertension, kidney

The Government argues that the BOP generally and Fort Dix in particular have taken drastic steps to ensure the safety of inmates. ECF No. 65 at 1, 7–8. There is evidence that these steps have been successful. *See Wragg v. Ortiz*, No. 20-CV-5496, 2020 WL 2745247, at *1 (D.N.J. May 27, 2020) ("[T]here are clearly measures in place at FCI Fort Dix that can mitigate effectively the spread of COVID-19."). Although some inmates at Fort Dix contracted COVID-19, the number of infected inmates has not ballooned like it has in other facilities—the number of infected inmates has remained relatively stable since Defendant made his motion in late April.[6]

In short, the Court is left with an incomplete record that provides some evidence that Defendant faces a greater than average risk of suffering adverse consequences if he contracts COVID-19 given his hypertension, kidney disease, asthma, and seizures. But Defendant's age does not increase his risk of adverse consequences and there is at least some evidence that his preexisting conditions are mild. For purposes of his motion, however, the Court accepts that Defendant faces some increased risk of COVID-19 complications.

Defendant has also mustered evidence tending to show that he faces a greater risk of contracting COVID-19 while incarcerated at Fort Dix than if he were released.[7] The degree of that risk, however, is open to debate. There is evidence the measures at Fort Dix have been effective

---

disease, and lung disease, are "at a high-risk for severe illness from COVID-19." *Id.* ¶¶ 9, 16 (internal quotation marks omitted).

[6] Defendant argues that the BOP has not adequately tested the prison population at Fort Dix. ECF No. 68 at 2. The record provides little information on the testing currently occurring at Fort Dix. It appears that symptomatic inmates are being tested and that every inmate in Fort Dix's satellite camp was tested. *See Wragg*, 2020 WL 2745247, at *2–6, *8–9, *21–22 (discussing COVID-19 testing at Fort Dix). Conversely, Fefferman criticized Fort Dix's practice of testing only symptomatic individuals. ECF No. 68-1 ¶¶ 20–21. The Court is not positioned to answer what testing protocols are appropriate for a facility like Fort Dix, but the Court does accept the general premise that Fort Dix's testing either has failed or may fail to identify all individuals infected with COVID-19. *See Wragg*, 2020 WL 2745247, at *4, *21–22 (noting a 15–48% false negative rate for the test used at Fort Dix).

[7] Defendant intends to live in Rochester, New York. ECF No. 68 at 13.

in limiting the spread of COVID-19 at that facility, and release would not absolve Defendant of the risk of infection. *See United States v. Veras*, No. 19-CR-10, 2020 WL 1675975, at *4 (M.D. Pa. Apr. 6, 2020) ("[T]he potential for exposure exists anywhere in the community, not just in jail . . . ."). The Court again, for purposes of his motion, accepts that Defendant faces some increased risk of infection while incarcerated at Fort Dix, but the record is insufficient to establish the degree of that risk.

The Court finds that the muddled record regarding the degree of Defendant's risk is insufficient to outweigh the Section 3553(a) sentencing factors that support maintaining his sentence. *See United States v. Weiskopf*, No. 19-CR-6093, 2020 WL 4013188, at *2–4 (W.D.N.Y. May 15, 2020) (denying compassionate release to defendant facing greater risk of COVID-19 complications and risk of exposure where actual likelihood of complications was not established and the risk shown by defendant did not outweigh the Section 3553(a) factors supporting his sentence). COVID-19 does not "warrant the release of every federal prisoner with health conditions that make them more susceptible to the disease." *United States v. Gold*, No. 15-CR-330, 2020 WL 2197839, at *1 (N.D. Ill. May 6, 2020) (internal quotation marks omitted); *see also United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release."); *cf. United States v. Seshan*, No. 14-CR-620, 2020 WL 2215458, at *4 (S.D.N.Y. May 6, 2020) (collecting cases in which courts denied compassionate release to inmates with serious medical conditions).

In support of his motion, Defendant claims that he has a low risk of recidivism because he has a good disciplinary record[8] while incarcerated and has completed a "significant amount" of

---

[8] Defendant initially claimed that he did not have any disciplinary violations. ECF No. 62 at 9. Defendant later admitted that he had at least one disciplinary violation—a fight—albeit he claimed it occurred over

rehabilitative programing. ECF No. 62 at 10–11. Defendant further expresses a desire to work in his family cleaning business and daycare, to work for a non-profit organization he co-owns, and to continue his education. *Id.* at 10; ECF No. 68 at 13. Defendant argues that his rehabilitation has been recognized in that his security level has been reduced. ECF No. 62 at 10. The Court commends Defendant for completing rehabilitative programming and his desire to become a productive member of society upon his release. Defendant's efforts weigh in his favor.

Any considerations weighing in Defendant's favor, however, are outweighed by the factors that supported and continue to support Defendant's current sentence. *See Seshan*, 2020 WL 2215458, at *4. Defendant's initial offense was very serious—Defendant possessed a rifle in furtherance of a nearly year-long conspiracy to distribute cocaine base and participated in that conspiracy by manufacturing cocaine base, packaging it for resale, and distributing it to others. ECF No. 47 at 4; ECF No. 61 ¶ 38. Further, Defendant was previously convicted of shooting an individual in the chest with a handgun. ECF No. 61 ¶ 57. Defendant's "participation in numerous programs while incarcerated" was already considered by the Court when it reduced his sentence in 2016. ECF No. 60. Perhaps most importantly, with a projected release date of August 17, 2024, Defendant has a significant amount of time remaining on his sentence. Given the serious nature of his offenses, such a drastic reduction in Defendant's sentence would undermine the need for his sentence "to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense," and "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(1), (2)(A)–(B).

Defendant disputes the exact computation of his remaining term of incarceration. ECF No. 68 at 11–12. Among other arguments, Defendant claims that time he may spend in a halfway house

---

twenty-two months ago. ECF No. 68 at 12. To Defendant's credit, the Probation Department reports that he has not had a disciplinary violation since 2018. ECF No. 64 at 1.

9

should not be considered part of his sentence. *Id.* This Court has previously recognized the potential harm in granting compassionate release where it robs a defendant of the benefits of halfway house placement. *See United States v. McBride*, No. 17-CR-192, 2020 WL 3496280, at *4 (W.D.N.Y. June 29, 2020). Accordingly, even accepting Defendant's argument that he may spend up to a year of his sentence in a halfway house, that time weighs against his compassionate release given the valuable rehabilitative programing available in such a setting. *See* 18 U.S.C. § 3553(a)(2)(D) (requiring the Court to consider the need for the sentence "to provide the defendant with needed educational or vocational training . . . or other correctional treatment in the most effective manner").[9]

Because of the mixed evidence regarding Defendant's risk, the substantial time remaining on Defendant's sentence, his serious offenses, and his criminal history, the cases cited by Defendant where courts have granted compassionate release are distinguishable. *See, e.g.*, *United States v. Quintero*, No. 08-CR-6007, 2020 WL 2175171 (W.D.N.Y. May 6, 2020) (granting compassionate release where individual had medical vulnerabilities, was housed at a facility with a demonstrated failure to contain the virus, and had minimal time remaining on his sentence); *United States v. Bess*, No. 16-CR-156, 2020 WL 1940809, at *11 (W.D.N.Y. Apr. 22, 2020) (granting compassionate release "[i]n light of the defendant's age, his serious health issues, the fact that his reoffending is unlikely, and the fact that he will remain under supervision for five years after his release").

The Court recognizes that the situation Defendant finds himself in is of serious concern: as an inmate, he has far less control over his environment and is far more reliant on correctional

---

[9] Counting halfway house placement, Defendant concedes he has at least two years remaining on his sentence. ECF No. 68 at 11. Although two years is substantially less than four, even accepting all of Defendant's arguments regarding the likely length of his incarceration, he is still currently obligated to serve a substantial amount of time, which counsels against his compassionate release.

officials to ensure his safety during the pandemic. "A just punishment should not include an unacceptable risk of exposure to COVID-19 or any potentially lethal disease." *United States v. Vence-Small*, No. 18-CR-31, 2020 WL 2214226, at *4 (D. Conn. May 7, 2020). But neither should the uncertainty engendered by the present crisis be allowed to distort or subvert a just punishment. Defendant has not demonstrated that a reduction in his sentence is appropriate.

## CONCLUSION

For the foregoing reasons, Defendant's Emergency Motion to Reduce Sentence, ECF No. 62, is DENIED.

IT IS SO ORDERED.

Dated: July 17, 2020
      Rochester, New York

                                    HON. FRANK P. GERACI, JR.
                                           Chief Judge
                                   United States District Court